**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**COLUMBIA DIVISION**

| | |
|---|---|
| PATSY McKENNON,        ) | |
| ) | |
| **Plaintiff,**      ) | |
| ) | |
| v.                          ) | **NO. 1:14-cv-0102** |
| ) | **CHIEF JUDGE CRENSHAW** |
| SOCIAL SECURITY        ) | |
| ADMINISTRATION,       ) | |
| ) | |
| **Defendant.**      ) | |

## MEMORANDUM OPINION

Pending before the Court is Patsy McKennon's *pro se* Motion for Judgment on the Administrative Record (Doc. No. 16), to which the Social Security Administration (SSA) has responded (Doc. No. 20.) Plaintiff filed a reply to the SSA's response. (Doc. No. 23.) Upon consideration of the parties' briefs and the transcript of the administrative record (Doc. No. 12),[1] and for the reasons set forth below, Plaintiff's Motion for Judgment will be DENIED and the decision of the SSA will be AFFIRMED.

### I.  Magistrate Judge Referral

In order to ensure the prompt resolution of this matter, the Court will VACATE the referral to the Magistrate Judge.  (Doc. No. 3.)

### II.  Introduction

Plaintiff filed an application for supplemental security income ("SSI") under Title XVI of the Social Security Act on December 15, 2011, and an application for disability insurance

---

[1] Referenced hereinafter by "Tr." followed by the page number found in bolded typeface at the bottom right corner of the page.

benefits ("DIB") under Title II of the Social Security Act on January 9, 2012,[2] alleging disability

onset as of October 14, 2011,[3] due to scoliosis and L2-L3[4] deterioration. (Tr. 156.) Her claim

for benefits was denied at the initial and reconsideration stages of state agency review. Plaintiff

subsequently requested *de novo* review of her case by an Administrative Law Judge ("ALJ").

Plaintiff's case was heard on February 20, 2013, when she appeared with counsel and gave

testimony. (Tr. 25-48.) Testimony was also received from an impartial vocational expert. (Id.)

At the conclusion of the hearing, the matter was taken under advisement until May 2, 2013,

when the ALJ issued a written decision finding Plaintiff not disabled. (Tr. 6-24.) That decision

contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since October 14, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: mild scoliosis; obesity; and depression (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with limitations. Specifically, from a postural stand point the claimant could frequently climb ramps and stairs, but only occasionally climb ladders, ropes, and scaffolds; she could frequently balance, stoop,

---

[2] The Act and implementing regulations regarding Disability Insurance Benefits (contained in Title II of the Act and 20 C.F.R. Part 404 of the regulations) and SSI (contained in Title XVI of the Act and 20 C.F.R. Part 416 of the regulations) are substantially identical. Barnhart v. Thomas, 540 U.S. 20, 24 (2003) (noting that the Title II and the Title XVI definition of "disability" is "verbatim the same" and explaining that "[f]or simplicity sake, we will refer only to the II provisions, but our analysis applies equally to Title XVI.") The Court will cite to the regulations interchangeably.
[3] With respect to the instant applications, Plaintiff alleged her disability onset date one day after the previous ALJ issued an unfavorable decision in connection with an application for DIB and SSI that Plaintiff filed on February 23, 2009. (Tr. 9.)
[4] L2-L3 refers to the second and third lumbar vertebrae. (Tr. 309.)

kneel, crouch, and occasionally crawl; and she should avoid production rate pace
work, as might be found on an assembly line.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and
   416.965).

7. The claimant was born on August 26, 1966 and was 45 years old, which is defined as
   a younger individual age 18-49, on the alleged disability onset date (20 CFR
   404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR
   404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past
   relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional
    capacity, there are jobs that exist in significant numbers in the national economy that
    the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act,
    from October 14, 2011, through the date of this decision (20 CFR 404.1520(g) and
    416.920(g)).

(Tr. 12, 14, 19-20.)

On July 16, 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's

decision (Tr. 1–3), thereby rendering that decision the final decision of the SSA. This civil

action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the

ALJ's findings are supported by substantial evidence based on the record as a whole, then those

findings are conclusive. Id.

### III. Prior Claim and Finding

Prior to filing the current applications, Plaintiff filed applications for DIB and SSI on

February 23, 2009. In her prior applications, Plaintiff alleged a disability onset date of March

11, 2006. Both applications were denied at the initial and reconsideration stages of state agency

review. Thereafter, Plaintiff requested *de novo* review of her case by an ALJ. The prior ALJ,

Claire R. Strong, heard the case on September 20, 2011. Plaintiff, who was represented by

counsel, appeared and testified at the hearing, as did an impartial vocational expert. At the conclusion of the hearing, the matter was taken under advisement until October 13, 2011, when a written decision finding Plaintiff not disabled was issued. (Tr. 49-66.)

In her written decision, ALJ Strong found that Plaintiff:

> has the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for 6 hours; sit for 6 hours; frequently climb ramps/stairs, balance, stoop, kneel, crouch, crawl; occasionally climb ladders/ropes/scaffolds; avoid concentrated exposure to hazards and heights; may demonstrate mild difficulty in her ability to consistently understand and remember complex instructions, directions and procedures within the work place, consistently and appropriately interact with co-workers, supervisors and the public and consistently and appropriately respond to changes in the job schedule on an independent basis; mild to moderate difficulty in her ability to sustain concentration and persistence for making complex work-like decisions within the job setting, in her ability to persist during work days without interruptions from psychological symptoms and in her ability to consistently and appropriately take necessary precautions against perceived hazards within the workplace.

(Tr. 56-57.)

## IV. Review of the Record

Prior to reviewing Plaintiff's medical records, the ALJ noted the October 13, 2011, unfavorable decision and explained that:

> [T]he claimant did not request that [ALJ Strong's] decision be reviewed by the Appeals Council. Thus, [that] decision became the final decision of the Commissioner of Social Security for that case and it is binding as to the determination of disability through that date. Under the provisions of the Dennard/Drummond[5] [line of cases] and attendant acquiescence rulings,[6]

---

[5] In <u>Denard v. Sect'y of Health and Human Servs.</u>, 907 F.2d 598, 598-99 (6th Cir. 1990) the Sixth Circuit held that a subsequent ALJ was estopped, on *res judicata* grounds, from contradicting a prior determination that a claimant was unable to perform his past relevant work. Following the reasoning in <u>Denard</u>, the Sixth Circuit, in <u>Drummond v. Comm'r of Soc.Sec.</u>, 126 F.3d 837 (6th Cir. 1997), held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." <u>Id.</u> at 840–42. Thus, if an earlier ALJ makes a finding regarding a claimant's RFC, a subsequent ALJ is bound by that RFC determination absent additional evidence that would support a contrary finding. <u>See</u>, <u>e.g.</u>, <u>Gay v. Comm'r of Soc. Sec.</u>, 520 F App'x. 354, 356 (6th Cir. 2013).

adjudications of any subsequently filed applications under the same title are bound by the residual functional capacity and other vocational information found in the prior final decision, absent evidence of a significant change in the claimant's medical condition during a relevant period. Review of the claimant's new application reveals that the claimant's alleged onset date falls after the previous Administrative Law Judge decision and, therefore, the entire period at question in this application is new and material and has not been previously adjudicated. The medical evidence shows that the claimant's overall medical condition has changed. The undersigned finds that the evidence in this matter suggests that the claimant's residual functional capacity during the relevant period, since the previous Administrative Law Judge decision, is not as restrictive as that determined by [the previous ALJ] in the prior claim.

(Tr. 9.) Because the ALJ found that Plaintiff's condition had improved since ALJ Strong's decision, he was not bound by ALJ Strong's residual functional capacity ("RFC") assessment. See Rudd v. Comm'r of Soc. Sec., 531 F. App'x 719, 725-26 (6th Cir. 2013) (noting that where new evidence established that the Plaintiff's condition had improved, the ALJ was not bound by prior residual functional capacity assessment).

The ALJ then summarized Plaintiff's medical records as follows:

Medical records document a limited treatment history with sporadic visits for acute issues and injuries during the period in question. Records reveal that, after her alleged onset date of October 14, 2011, the claimant was initially treated at the emergency department for an injury to her head in November of 2011. The claimant reported that she had been doing yard work when she was struck in the head by a tree limb. Even when the claimant returned to the emergency department, a week later, with continued headache complaints, computed tomography (CT) scans of her head were noted to be normal (Exhibit B10F).

Thereafter, the claimant returned to the emergency room on three other occasions with complaints of injuries. In December of 2011, the claimant reported that she had fallen and hurt her right wrist, left ankle, and low back. Despite the claimant's complaints of pain, she was noted to exhibit a steady gait with independent ambulation, a full range of motion in all tested areas, no weakness in any tested area, and a normal neurological examination. Diagnostic testing was also noted to be relatively normal, as x-rays of the claimant's right wrist and left

---

[6]An Acquiescence Ruling is issued when the SSA "determine[s] that a United States Court of Appeals holding conflicts with [its] interpretation of a provision of the Social Security Act or regulations and the Government does not seek further judicial review or is unsuccessful on further review." 20 C.F.R. § 416.1485.

ankle could not rule out tiny avulsion fractures and x-rays of the claimant's lumbar spine revealed degenerative disc disease at the L2-L3 level, but x-ray studies of the claimant's left foot, left tibia, left fibula, left knee, and right forearm were all normal. Records reveal that the claimant followed her visit to the emergency room with a trip to Dickson Community Clinic several days later. Clinic notes indicate no physical examination findings, however, the claimant was noted to have a history of scoliosis with chronic low back pain, at that time (Exhibits B2F and B10F).

The claimant did not seek or receive further medical treatment after her December visits until presenting to the emergency department following another reported fall in May of 2012. At that time, the claimant complained of left leg and low back pain and she was again noted to demonstrate steady gait with independent ambulation. The claimant was also found to exhibit full ranges of motion with no weakness and she was noted to be intact neurologically. Additional diagnostic testing revealed normal x-rays of the claimant's left hip and knee and x-rays of the claimant's lumbar spine revealed well-maintained vertebral body heights and normal alignment with stable degenerative disc disease noted at L2-L3. The claimant was diagnosed with a left hip/knee sprain and a lumbar strain status post fall and she followed her emergency room visit with a visit to the Baptist Hickman Medical Clinic, where she was noted to be somewhat better after less than a week (Exhibits B10F; B11F; andB14F).

Records indicate that the claimant did not return for or complain of any further musculoskeletal problems until October of 2012. Treatment records further indicate that the claimant sought treatment from yet another provider at that time, as she presented to the Lewis Health Center for a new patient visit. The claimant complained of a rash and low back pain and she reported that she had a bulging disc in her back. A physical examination of the claimant revealed only that she demonstrated a decreased range of motion and she was diagnosed with chronic low back pain and insect bites. Less than one week later, the claimant returned to the emergency department. She was noted to be limping and she reported that she had hurt her back and hip lifting a bag of dog food several days earlier. Physical examination notes established that the claimant was found to demonstrate a full range of motion and a steady gait with no assistance.

The claimant was diagnosed with an acute lumbar strain and obesity, at that time. Records lack any evidence or indication that the claimant sought, received, or required additional medical treatment after that visit in October of 2012 (Exhibits B12F and B14F).

The claimant underwent a psychological consultative examination with Paul W. Brown, Ph.D., in April of 2012. The claimant reported that she suffered from adjustment disorder, anxiety, and depression. The claimant indicated that her appetite was poor and her energy was low. She rep1ied that she had been

sexually abused by her grandfather and while she was in foster care. She described her family as "crazy." She noted that she quit school in the tenth grade, because she was pregnant, but she stated that she had obtained her GED in 2008. The claimant reported that she cleaned the house, performed light household tasks, and watched some television, on a normal day. She indicated that she did not go shopping by herself or access public transportation, but she noted that she did drive on short trips. Dr. Brown noted that the claimant appeared to be relaxed and at ease and he described the claimant as cooperative, pleasant, and friendly. He noted that the claimant maintained good eye contact and good articulation of her speech with well-organized and goal-oriented thought processes. Dr. Brown indicated that the claimant showed no evidence of delusions or abnormal thought ideations, but her mood appeared to be depressed and her affect was flat. Dr. Brown noted that the claimant's insight, judgment, critical thinking, and problem solving appeared to be fair. He noted that her attention span and concentration seemed to be average and her memory was intact with no signs of excessive distractibility. Dr. Brown noted that the claimant was able to sit still and remain focused and he indicated that she was able to do activities with minimal prompting and no supervision or assistance. He determined that the claimant would be capable of performing simple routine activities on a consistent basis over longer periods of time. Dr. Brown concluded that the claimant warranted a diagnosis of adjustment disorder with moderate depressed mood with a global assessment of functioning (GAF) score of 60 to 65, at that time. He also determined that the claimant would have only mild to moderate limitations in understanding and remembering, sustaining concentration and persistence, interacting with others, and adapting to changes and requirements (Exhibit B6F). The undersigned gives the statements by consultative examiner, Paul W. Brown, Ph.D., significant weight, as his was the only psychological assessment of the claimant throughout the period in question and the assessment was consistent with assessments from prior to the period.

The claimant is clearly obese and has numerous references to obesity in the medical record. The undersigned notes that there is no specific level of weight or Body Mass Index (BMI) that equates with a "severe" or a "not severe" impairment. Descriptive terms for levels of obesity (e.g., "severe," "extreme," or "morbid" obesity) also do not establish whether obesity is or is not a "severe" impairment for disability program purposes. The undersigned must perform an individualized assessment, based on the record, of the impact of obesity on an individual's functioning when deciding whether the impairment is severe.

With regard to the claimant's obesity, the medical records document that in November 2011, the claimant weighed 230 pounds. Most recently, the records indicate the claimant weighed 243 pounds in October 2012. The undersigned notes that in none of the treatment notes have her physicians commented that the claimant has been advised that her weight affects her other medical conditions or that her other conditions would improve if she lost weight. As such, despite the

claimant's increase in weight during the time period in question, the medical records do not support a finding that the claimant's obesity has so substantially exacerbated her other severe impairments so as to diminish her residual functional capacity and render her unable to work. (See S.S.R. 02-01p).

In light of the aforementioned objective medical evidence, the undersigned has considered the hearing testimony of the claimant and finds that her allegations are not fully credible. While there are allegations of disabling limitations due to the claimant's mental and physical impairments, the objective medical evidence fails to support such a severity of impairment in this case. The claimant testified that she is in pain all of the time, however, there is no objective evidence of any significant anatomical structural deformities or nerve root compression which might be expected based on the degree of back and hip pain alleged. In fact, her most recent lumbar x-rays indicated that the degeneration at L2-L3 was stable and her vertebral disc heights were well maintained with normal alignment. Additionally, x-rays of the claimant's hip revealed no osseous abnormalities at all. Furthermore, the claimant testified that she cared for all of the needs of her disabled daughter, including lifting her into the shower seat, bathing her, dressing her, and getting her into and out of her wheelchair. The claimant also testified that she performed all of the household chores, cooking, shopping, and money management, as well as some of the yard work. With respect to her mental health allegations, the claimant testified that she was fatigued and lacked motivation and desire to do things because of her depression. However, the claimant also testified to having a boyfriend and a close friend that she spent time with regularly, in addition to her numerous activities of daily living. The claimant also testified that she attended church regularly and spent considerable time grocery shopping. Moreover, the medical records document that the claimant only sought medical treatment following an acute injury, such as a fall, and she never sought mental health treatment during the period in question.

As for the opinion evidence, the undersigned notes that there are no formal treating source opinions in the record with respect to the claimant's disability case. However, in accordance with the guidelines in Social Security Ruling 96-6p, the undersigned has carefully considered the residual functional capacity assessment completed by the State Agency and the findings of fact made by the State Agency and other program physicians regarding the nature and severity of the claimant's impairments. These assessments have been considered to be expert medical opinions of non-examining sources. The State Agency physicians assessed the claimant as having no significant medical problems that would cause her to be unable to perform exertion at the light work level with frequent balancing, stooping, kneeling, crouching, and climbing ramp and stairs and occasional crawling and climbing ladders, ropes, or scaffolds (Exhibit B5F). The State Agency psychiatrists assessed the claimant as having no significant mental problems that would prevent her from being able to understand and remember simple, detailed, and multi-step detailed tasks, but not make independent

decisions at an executive level; concentrate and persist for an eight-hour day with customary breaks; interact with the public, co-workers and supervisors; and adapt to routine changes and set independent goals (Exhibit B9F). Because these assessments and findings of fact were made after a review of the majority of the medical evidence in the file and are consistent with the objective medical evidence later received, the undersigned gives these assessments great weight.

(Tr. 16–19.)

## IV. Conclusions of Law

### A. Standard of Review

This Court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. See Hernandez v. Comm'r of Soc. Sec., 644 F. App'x 468, 473 (6th Cir. 2016) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case de novo, resolve conflicts in evidence, or decide questions of credibility." Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ

fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." Miller, 811 F.3d at 833 (quoting Gentry v. Comm'r of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014)).

## B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

Parks v. Soc. Sec. Admin., 413 F. App'x 856, 862 (6th Cir. 2011) (citing Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . .'" Kepke v. Comm'r of Soc. Sec., 636 F. App'x 625, 628 (6th Cir. 2016) (quoting Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. See Anderson v. Comm'r of Soc. Sec., 406 F. App'x 32, 35 (6th Cir. 2010); Wright v. Massanari, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. Wright, 321 F.3d at 615–16; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. Anderson, 406 F. App'x at 35; see Wright, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's RFC at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Glenn v. Comm'r of Soc. Sec., 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. Plaintiff's Statement of Errors

In her *pro se* Motion for Judgment on the Administrative Record, Plaintiff does not make specific allegations of error, but instead, generally argues that the ALJ's decision was not supported by substantial evidence. Not surprisingly, Defendant argues that the ALJ's decision is supported by substantial evidence based on the record as a whole.

The ALJ found that Plaintiff maintained the ability to perform light work as defined by the regulations with several postural limitations, and that she should avoid production rate pace work. (Tr. 14.) The ALJ's findings were based on his careful consideration of the record as a whole including: (1) the credibility of Plaintiff's testimony at the hearing; (2) the medical evidence regarding Plaintiff's physical impairments; (3) the medical evidence regarding Plaintiff's mental impairments; and (4) the medical opinion evidence.

#### 1. Plaintiff's Credibility

The ALJ found that Plaintiff's testimony about "the intensity, persistence and limiting effects of [her] symptoms" was not "entirely credible." (Tr. 16.)

The ALJ, not the court system, is tasked with evaluating a witness' credibility; credibility findings must be "grounded in the evidence and articulated in the determination or decision." SSR 96-7P, 1996 WL 374186 at *4 (July 2, 1996); Rogers v. Commissioner, 486 F.3d 234, 247 (6th Cir. 2007). In addition to the objective evidence, the ALJ should consider the following factors when assessing the credibility of a claimant's statements regarding his symptoms:

1.      The individual's daily activities;

2.      The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.      Factors that precipitate and aggravate the symptoms;

4.      The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.      Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.      Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.      Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7P, 1996 WL 374186 at * 3. Under SSR 96–7p the ALJ is required to "consider" the seven listed factors, but there is no requirement that the ALJ discuss every factor. See White v. Commissioner, 572 F.3d 272, 287 (6th Cir. 2009); see also Coleman v. Astrue, No. 2:09–cv–36, 2010 WL 4094299, at * 15 (M.D. Tenn. Oct. 18, 2010) (finding that "[t]here is no requirement [ ] that the ALJ expressly discuss each listed factor."); Roberts v. Astrue, No. 1:09–cv–1518, 2010 WL 2342492, at * 11 (N.D. Ohio June 9, 2010) (finding that "the ALJ need not analyze all seven factors contained in SSR 96–7p to comply with the regulations"). Nevertheless, the Sixth Circuit recognizes that meaningful appellate review requires more than a blanket assertion by an ALJ that "the claimant is not believable." Rogers, 486 F.3d at 248. The court observed that Social Security Ruling 96–7p requires that the ALJ explain his or her credibility determination and that the explanation "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id.

The ALJ considered the factors set forth in SSR 96-7P in his extensive summary of Plaintiff's testimony at the hearing.  (See Tr. 15-16.)  He noted that Plaintiff testified that she engaged in extensive activities of daily living, including doing all the cooking, the housework, the shopping and some of the yard work.  (Tr. 15; see also, Tr. 31-33.)  Additionally, Plaintiff testified that she had to do everything for her twenty-five-year-old disabled daughter.  (Id.)  Plaintiff testified that caring for her daughter required Plaintiff to help her daughter move from her wheelchair onto a shower chair, help her daughter bathe, wash her daughter's hair, pick out her daughter's clothes, dry her daughter's hair, dress her daughter, and settle her back into her wheelchair.  (Id.)  Plaintiff testified that taking care of household chores was a day-long process and she often worked 5 to 6 hours straight, but she also testified that she could not get out of bed on "bad days" and that she had "bad days" 3 to 4 days each week, and upwards of 6 to 12 days each month.  (Tr. 15, see also Tr. 42-43.)  However, when asked by the ALJ, Plaintiff testified that her last bad day was "about a week ago."  (Tr. 44-45.)

Plaintiff testified that she had a "light" heart attack, but neither the ALJ, nor Plaintiff's counsel, could locate any evidence in the record to substantiate Plaintiff's claim.  (Tr. 12, 15, 35-37.)  Plaintiff went to the hospital, where the providers found no evidence of damage to Plaintiff's heart.  (Tr. 12, 36-37.)[7]

The ALJ noted that Plaintiff takes medication for high blood pressure and fluid retention.  (Id.)  Nevertheless, for what she considers to be her chief complaints—"back pain and migraines,"[8] Plaintiff does not take any prescription medication on a consistent basis because,

---

[7] Plaintiff testified that she was kept at the hospital for three weeks, but the records in evidence do not appear to substantiate this testimony.  (Tr. 37, 412-14.)

[8] Although at the hearing Plaintiff testified that "the migraine and my back is the biggest thing," in her application for benefits, she did not list migraines as a limitation.  (Tr. 43, 156.)

14

she testified, the medication she receives for these conditions, cause her to be unable to function. (Tr. 16, 44-45.) Plaintiff does not take any medication for her depression and has never sought mental health treatment, due to the cost of such treatment. (Tr. 15.) The ALJ noted that despite Plaintiff's claim that her pain frequently renders her unable to get out of bed, her medical records "document a limited treatment history with sporadic visits for acute issues and injuries during the period in question." (Tr. 16.)

After reviewing all of the "objective medical evidence" and considering Plaintiff's testimony in light of such evidence, the ALJ found that the evidence failed to support Plaintiff's allegations of "disabling limitations due to [her] mental and physical impairments." (Tr. 18.) The ALJ's credibility finding is supported by substantial evidence and he sufficiently explained the reasoning behind his determination that Plaintiff's testimony was not entirely credible.

## 2. Evidence of Physical Impairments

The ALJ summarized the evidence related to Plaintiff's physical impairments. He noted that Plaintiff was treated in the emergency department at Horizon Medical Center on November 9, 2011, for an injury to her head, after she was struck in the head by a branch while doing yard work. (Tr. 16, 391-95.) A CT Scan of Plaintiff's head showed no abnormality. (Tr. 396.) When Plaintiff returned the emergency department on November 15, 2011, with the same complaint, a second CT Scan revealed the same results. (Tr. 16, 404.)

The ALJ noted that Plaintiff was back at the Horizon Medical Center emergency department on December 8, 2011, after falling and hurting her right wrist, left ankle and low back, but all testing and imaging revealed no abnormality except the radiologist could not rule out a "tiny avulsion injury" to Plaintiff's right wrist and x-rays revealed degenerative disc disease at L2-L3 of Plaintiff's lumbar spine. (Tr. 16, 302-11.) As the ALJ noted, Plaintiff

followed her visit to the emergency department with a visit to the Dickson Community Clinic on December 12, 2011, however, except for the apparent provision of an ankle support, the records do not reflect any treatment with respect to Plaintiff's injured right wrist, left ankle or low back. (Tr. 16, 225.)

Plaintiff did not seek medical treatment again until approximately five months later when, on May 15, 2012, she returned to the emergency department at Horizon Medical Center after falling off a step and injuring her left leg and lower back. (Tr. 16, 312-21, 471-85.) Once again, testing and imagining revealed no abnormalities, (Tr. 16, 319-20), except Plaintiff's degenerative disc disease at L2-L3, which was noted and determined to be stable when compared to the December 8, 2011, x-rays of the same area (Tr. 16, 321). As the ALJ noted, at this visit Plaintiff was diagnosed with a left hip/knee sprain and a lumbar strain. (Tr. 16, 472.) She followed her emergency department visit with a visit to the Baptist Hickman Medical Clinic on May 21, 2012, where she was reported to be "some[what] better" but her knee "seems to be the wors[t] right now." (Tr. 16, 415.)

The ALJ noted that Plaintiff did not obtain any further treatment for musculoskeletal problems until October 3, 2012,[9] when she visited the Lewis Health Center complaining of insect bites, chronic low back pain, hypertension and lower extremity swelling. (Tr. 17, 420-24.) Plaintiff claimed to have a bulging disc in her back, but a physical examination revealed only that she demonstrated decreased range of motion. (Tr. 17.) Her hypertension and lower extremity swelling were found to be "controlled." (Tr. 422.) As the ALJ observed, less than one

---

[9] On July 18, 2012, Plaintiff visited the Horizon Medical Center emergency department complaining of dizziness, weakness, hypertension and a "vague sense of not feeling well." (Tr. 445-470.) After extensive testing, of Plaintiff's heart, the findings were essentially normal and Plaintiff was discharged with no new medication and with instructions to see her physician. (Id.)

week later, on October 9, 2012, Plaintiff visited the Horizon Medical Center emergency department complaining of right hip and lower back pain that she claimed started three days prior to her visit when she hurt her back lifting a bag of dog food.  (Tr. 427-444.)  Plaintiff was noted to be limping.  (Tr. 17, 428-29.)  She was diagnosed with acute lumbar strain.  (Tr. 428.)  As the ALJ observed, the "[r]ecords lack any evidence or indication that the claimant sought, received or required additional medical treatment after that visit in October of 2012."  (Tr. 17.)

The objective medical evidence in the record supports the ALJ's finding that Plaintiff's physical impairments are not as limiting as she has alleged. [10]  As the ALJ observed, Plaintiff's treatment records establish that she sought treatment for "acute issues and injuries during the period in question."  (Tr. 16.)  Moreover, except for the stable degenerative disc disease at L2-L3, Plaintiff's imaging studies and physical examinations were largely normal, or showed mild or minimal problems associated with the triggering incident.  For example, after her December 2011 fall, the radiologist examining Plaintiff's x-rays concluded that he could not rule out a "tiny avulsion" fracture of her right wrist or at her October 9, 2012, visit to the Horizon Medical Center emergency department after she hurt her right hip and lower back lifting a bag of dog food, she was diagnosed with an acute lumbar strain.  (Tr. 16, 311.)

With respect to the Plaintiff's claim that her obesity was a disabling impairment, Social Security Ruling 02–1p explains the SSA's policy on the evaluation of obesity.  Although the SSA no longer qualifies obesity as a "listed impairment," the ruling "remind[s] adjudicators to

---

[10] The ALJ identified two additional medically determinable impairments—hypertension and congestive heart failure ("CHF"), both of which he found to be non-severe impairments.  With respect Plaintiff's hypertension, the ALJ found that the evidence established that Plaintiff's hypertension was "well-controlled" with medication.  Additionally, he found that the "records indicate that [Plaintiff] has not developed any associated complications from hypertension." (Tr. 12.)  With respect to Plaintiff's CHF, the ALJ noted that Plaintiff was diagnosed with CHF prior to the period in question and the records from the period in question "lack any evidence or indication of heart-related problems."  (Id.)  The ALJ noted that records from the period in question "show no further evidence of complications or complaints" related to Plaintiff's prior CHF diagnosis.  (Id.)

consider its effects when evaluating disability." SSR 02–1p, 2000 WL 628049, at *1 (S.S.A.). SSR 02–1p states, in pertinent part, "[a]n assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." Id. at *6. The Sixth Circuit has made clear that it is "a mischaracterization to suggest that Social Security Ruling 02-1p offers any particular procedural mode of analysis for obese disability claimants." Bledsoe v. Barnhart, 165 F. App'x 408, 412 (6th Cir. 2006).

The ALJ recognized that he was required to "perform an individualized assessment, based on the record, of the impact of obesity on [Plaintiff's] functioning." (Tr. 18.) Thus, after considering the medical evidence in the record, the ALJ observed that in "none of the treatment notes have [Plaintiff's] physicians' commented that [Plaintiff] has been advised that her weight affects her other medical conditions or that her other conditions would improve if she lost weight. (Id.) As a result, the ALJ found that "the medical records do not support a finding that the [plaintiff's] obesity has so substantially exacerbated her other severe impairments so as to diminish her residual functional capacity and render her unable to work." (Tr. 18.)

### 3. Evidence of Mental Impairments

As the ALJ observed, the plaintiff was not taking medication, nor had she sought treatment for her depression during the period in question. (Tr. 15.) A reasonable person could expect that when a Plaintiff alleges that her symptoms are so severe as to be disabling, that she would seek medical treatment to ameliorate those symptoms. Strong v. Soc. Sec. Admin., 88 F. App'x 841, 846 (6th Cir. 2004). Conversely, a reasonable person could infer that a Plaintiff's failure to seek medical treatment shows that her allegations of disabling symptoms may be exaggerated. Id.; see also SSR 96-7p, 1996 WL 374186, at *7 (noting that "the individual's

statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints"). As such, the ALJ could reasonably have inferred that the absence of mental health treatment belied Plaintiff's allegation, and her testimony that her depression was disabling.

However, Plaintiff testified that she had not sought treatment because of the cost. Nevertheless, "[t]he issue of poverty as legal justification for failure to obtain treatment does not arise unless a claimant is found to be under a disabling condition." Strong, 88 F. App'x at 846 (citing McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990)). Here, the ALJ found that the evidence in the record did not establish that Plaintiff's mental impairment was disabling. Indeed, the records indicate that Plaintiff infrequently, if ever, complained of any issues concerning her mental health during her visits to medical providers. (See, e.g., Tr. 225, 324, 430.) Additionally, it is worth noting that, as evidenced by her repeated visits to medical clinics and the Horizon Medical Center emergency department, Plaintiff knew how to obtain treatment despite her lack of finances.

Plaintiff also testified that she had spoken with other physicians "about her depressive symptoms, but she noted that those [physicians] recommended following [up] with a mental health professional. (Id.) There do not appear to be any medical records substantiating Plaintiff's testimony that she spoke with medical providers regarding her depressive symptoms. Indeed, many of the records in evidence note that Plaintiff's mood and affect were "normal" and fail to reflect that the medical provider observed any evidence of depressed mood or flat affect, let alone that Plaintiff mentioned depression as an issue of concern. (See, e.g., Tr. 225, 324, 430). The absence of any records of mental health treatment or prescriptions for psychotropic medication suggests that even if given the medical advice to seek treatment, Plaintiff did not do

so. While failure to seek treatment, "should not be a determinative factor" in assessing the credibility of Plaintiff's claims of disabling condition, where there is no evidence suggesting that Plaintiff's mental condition hindered her from seeking examination or treatment, a claimant's failure to seek such treatment "may cast doubt" on her assertions of disabling impairments. Strong, 88 F. App'x at 846.

### 4. Opinion Evidence

As the ALJ noted, "there are no formal treating source opinions in the record with respect to the claimant's disability case." (Tr. 18.) Because there were no treating source opinions to assign controlling weight, the ALJ was required to review the other medical opinions pursuant to 20 C.F.R. § 404.1527(c)(2) and 20 C.F.R. § 416.927(c)(2), which set forth factors the ALJ should consider when deciding the weight to give medical opinions, including the supportability of the opinion and the consistency of the opinion with the record as a whole. Additionally, "Social Security regulations recognize that opinions from non-examining state agency consultants may be entitled to significant weight, because these individuals are 'highly qualified' and are 'experts in Social Security disability evaluation.'" Cobb v. Comm'r of Soc. Sec., No. 1:12–cv–2219, 2013 WL 5467172, at *5 (N.D. Ohio Sept. 30, 2013) (quoting 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i)); see also Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994).

In the absence of any treating source opinions, the ALJ was required to consider and weigh the medical opinions of the sole state agency examiner and numerous state agency consultants. The ALJ gave "significant weight" to the opinion of Paul W. Brown, Ph.D., who conducted a psychological assessment of Plaintiff because "his was the only psychological assessment of the claimant throughout the period in question and the assessment was consistent

with the assessments from prior to the period." (Tr. 17, 266-74.)[11]   After conducting his assessment, Dr. Brown "concluded that the claimant warranted a diagnosis of adjustment disorder with moderate depressed mood" however, he also found that Plaintiff's "insight, judgment, critical thinking and problem solving" were fair, her "attention span and concentration" were average, "her memory was intact with no signs of excessive distractibility," she "was able to sit still and remain focused" and she "was able to do activities with minimal prompting and no supervision or assistance."   As such, Dr. Brown "determined that the claimant would have only mild to moderate limitations in understanding and remembering, sustaining concentration and persistence, interacting with others, and adapting to changes and requirements."   (Tr. 18.)

The ALJ also considered the opinions of non-examining state agency consultants.  Eran Stanley, M.D., completed a Psychiatric Review Technique Form, a DDS Medical Consultant Analysis form, and a Mental RFC Assessment, (Tr. 275-97), and, as the ALJ observed, assessed Plaintiff "as having no significant mental problems" that would interfere with her ability to work, other than the limitation that Plaintiff would not be able to "make independent decisions at an executive level."  (Tr. 18-19.)  Sannagai Brown, M.D., completed a Physical RFC Assessment, (Tr. 239-47), and Celia Gulbenk, M.D., completed a DDS Medical Consultant Analysis form and a Physical RFC Assessment, (Tr. 249-63), and both assessed Plaintiff "as having no significant medical problems that would cause her to be unable to perform exertion at the light work level with" the limitations as described in the ALJ's RFC (Tr. 18).  The ALJ gave "great weight" to the opinions of the non-examining providers because their "findings of fact were made after a

---

[11] The record also contained the psychological assessment of Mark W. Petro, Ph.D., who examined Plaintiff on January 19, 2010, prior to the date of disability onset at issue here.  Dr. Petro's assessment was not substantially different than Dr. Brown's.   (Compare Tr. 218-22 with Tr. 266-74.)

review of the majority of the medical evidence in the file and are consistent with the objective medical evidence later received . . . ." (Tr. 19.)[12]

Based on the foregoing, the ALJ's decision that Plaintiff's mental and physical impairments were not disabling is supported by substantial evidence on the record as a whole. Accordingly, the ALJ's decision will be affirmed.

## V. Conclusion

In light of the foregoing, Plaintiff's Motion for Judgment on the Administrative Record will be DENIED and the decision of the SSA will be AFFIRMED.

An appropriate order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[12] While the state agency consultants may not have had all of the evidence in the record at the time of their assessments, the ALJ may still rely on the assessments of the state agency consultants, where, as here, the ALJ gives "some indication that [he] . . . considered these [new] facts before giving greater weight to an opinion that is not based on a review of a complete case record." Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 642 (6th Cir. 2013) (internal citations and quotation marks omitted). The ALJ gave sufficient indication here, explicitly noting in his discussion that the non-examining source opinions were consistent with the record as a whole. (Tr. 19.)